UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOHN LAWHON,

     Plaintiff,

v.                                       Case No: 8:19-cv-2333-T-36JSS

AARON'S, INC.,

     Defendant.

_____/

# <u>O R D E R</u>

This cause comes before the Court upon Defendant's Opposed Motion to Dismiss or, Alternatively, to Stay this Action and Compel Arbitration (the "Motion to Compel Arbitration"), (Doc. 6), and Plaintiff's Motion for Leave to Conduct Limited Discovery Pending Court Decision on Defendant's Motion to Compel Arbitration (the "Motion for Leave to Conduct Limited Discovery"), (Doc. 14). Plaintiff responded in opposition to the Motion to Compel Arbitration, (Doc. 11), and Defendant replied, (Doc. 17). Defendant also responded in opposition to the Motion for Leave to Conduct Limited Discovery. (Doc. 18). The Court, having considered the parties' submissions and being fully advised in the premises, will grant the Motion to Compel Arbitration and deny the Motion for Leave to Conduct Limited Discovery.

## I.    BACKGROUND

### A.  Introduction

John Lawhon ("Plaintiff") has worked for Aaron's, Inc. ("Defendant") for over seventeen years. (Doc. 1-1 ¶16). Plaintiff contends that he worked approximately 2,700 overtime hours without compensation during this time. *Id.* at ¶54. Plaintiff, who suffers from diabetes and depression, also claims that Defendant discriminated against him by failing to promote him as a

result of these disabilities. *Id.* at ¶¶42, 44, 47. As such, Plaintiff presently brings claims against Defendant under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), and the Florida Civil Rights Act, Fla. Stat. § 706.01 *et seq. Id.* at ¶¶58–67. In his complaint, Plaintiff alleges that Defendant presented "an Arbitration Agreement electronically" to him "[d]uring [his] employ," but he "did not accept it" and "advised" Defendant's Human Resources department that he did not accept the arbitration agreement. *Id.* at ¶12. Defendant timely removed this action from state court, (Doc. 1 at 2), and now moves to dismiss this action or stay the action and compel arbitration, pursuant to 9 U.S.C. §§ 3 and 4, (Doc. 6 at 1). Plaintiff moves the Court for leave to conduct limited discovery relevant to Plaintiff's alleged decision to opt out of arbitration. (Doc. 14 at 3).

### B.  Motion to Compel Arbitration

In the Motion to Compel Arbitration, Defendant argues that Plaintiff's claims fall within the scope of an arbitration agreement that Plaintiff signed with Defendant. (Doc. 6 at 6). In support of the Motion to Compel Arbitration, Defendant provides the declaration of Jill A. Reinert ("Reinert"), Defendant's Director of Human Resources. A copy of the Agreement to Arbitrate (the "Agreement") is attached to Reinert's declaration. Defendant designed its arbitration program to provide its employees, to which Defendant refers as "associates" or "team members," with "a forum for resolving issues in the workplace." (Doc. 6-1 at 2–3). The Agreement contains several significant provisions.

By signing the Agreement, an employee and Defendant "each agree that all Claims" between the employee and Defendant "will be exclusively decided by arbitration governed by the Federal Arbitration Act before one neutral arbitrator and not by a Court or a Jury." *Id.* at 8. Further, the Agreement states that the parties understand and agree that, by utilizing arbitration to resolve "Claims," they are giving up any right they may have to a trial by judge or jury. *Id.* at 12. In

2

defining "Claims," the Agreement broadly references causes of action arising out of the employment relationship between the employee and Defendant:

### Section 4: Covered Claims

As used in this Agreement, "Claims" means all disputes between you and the Company, including but not limited to disputes arising out of or related to your application for employment, your employment by the Company, or your separation from employment with the Company (including any job-related post-separation disputes) and includes any such disputes with current or former owners, members, officers, managers, supervisors, associates, or agents of the Company whether acting in their official or individual capacity. The term "Claims" includes, but is not limited to, any claim arising under federal, state or local law, under a statute such as Title VII of the Civil Rights Act of 1964 (Title VII), the Equal Pay Act of 1963 (EPA), the Fair Labor Standards Act (FLSA), the Family and Medical Leave Act (FMLA), the Americans with Disabilities Act (ADA), the Age Discrimination in Employment Act (ADEA), 42 U.S.C. § 1981, Title II of the Genetic Information Nondiscrimination Act of 2008 (GINA) and the Uniformed Services Employment and Reemployment Rights Act (USERRA), to name a few, under a rule, regulation or the common law, including, but not limited to any wage and hour claim of discrimination, harassment, retaliation, defamation, or wrongful discharge.

*Id.* at 8. The Agreement "covers any Claims subject to arbitration which are brought on or after March 1, 2017, even if the alleged act or omission occurred prior to March 1, 2017." *Id.* at 9.

Under the Agreement, the parties recognize that Defendant "operates in many states in interstate commerce" and they "acknowledge and agree that the Federal Arbitration Act, 9 U.S.C. § 1, et seq., shall govern this Agreement and arbitration." *Id.* at 11. Indeed, Defendant "operates a network of corporate-owned retail stores throughout the United States" and "employees travel between states to conduct business on behalf of [Defendant] and conduct business at Defendant's corporate office in Atlanta, Georgia." *Id.* at 3. According to Reinert, employees are required either to sign and agree to the Agreement as a condition of employment or opt-out. *Id.* at 4.

To that end, an employee may opt-out of the Agreement:

3

**Section 17: Right to Opt-Out**

**If you do not wish to be bound by the terms of this Agreement, you must opt out by notifying the Company in writing, using the Company's designated opt-out form. In order to opt out of the benefits of this Agreement, you must fully complete and submit the opt-out form within thirty (30) days of the date on which the Company published this Agreement to you electronically (the "Opt-Out Period"). You can access the opt-out form by clicking:** http://my.aarons.com/sites/documentcenter/Documents/Aaron's_Arbitration_Agreement_OptOut_Election_Form.pdf. **To be effective, the opt-out form must be signed by you, dated, it must contain all of the requested information in legible print, and it must be postmarked and sent via traceable mail (e.g., trackable US Mail, FedEx, UPS, etc.) or delivered via hand delivery within the Opt-Out Period. Retain proof of sending the opt-out form via traceable mail for your records.**

Should you choose to opt out of the Agreement, you acknowledge and agree that the Company is no longer bound by the terms of the Agreement and may elect to bring any covered Claims it has against you in a court rather than in arbitration. In addition, should you choose to opt out of the Agreement, Aaron's, Inc. and you agree to mutually waive the right to a trial by jury in a court of competent jurisdiction in an action filed in which Aaron's, Inc. (or any of its predecessors and successors in interest, assignees, parents, subsidiaries, divisions, related companies, entities, and their past, present and future shareholders, owners, officers, directors, supervisors, managers, associates, or agents whether acting in their official or individual capacity) and you both are a party. Instead, the action would be tried by a judge.

Should you timely opt out as provided in this paragraph, you will not be subject to any adverse employment action as a consequence of that decision and you may pursue available legal remedies without regard to this Agreement.

*Id.* at 12 (emphasis in original).

The Agreement also contains a merger clause, which states, in relevant part:

**This Agreement contains the entire agreement between you and the Company regarding arbitration, and it supersedes any and all prior representations or statements by any manager, Associate, or agent of the Company**. The terms of this Agreement control over any prior arbitration agreements you may have signed

4

> with the Company and any prior discussions you may have had with
> a Company representative about arbitration.

*Id.* at 9 (emphasis in original).

Finally, the Agreement provides:

### Section 18: Effect of Signing Agreement

> If you do not timely opt out of the Agreement as provided in Section
> 17, above, you will be bound by its terms, even if you do not sign it.

*Id.* The Agreement provides a place for an employee to "knowingly and voluntarily" sign, having "carefully read the foregoing sections." *Id.*

Defendant provides Plaintiff's purported electronic signature page, which indicates that Defendant published the Agreement on February 28, 2017, *id.* at 14, although other evidence provided by Defendant indicates that Defendant distributed the Agreement electronically on March 1, 2017, (Doc. 17-2 at 2). Regardless, Reinert states that Plaintiff electronically signed the Agreement, (Docs. 17-1 at 2), and the electronic signature page, attached to Reinert's declaration, indicates that Plaintiff, through his user identification, electronically signed the Agreement at 5:08 p.m. on March 6, 2017. *Id.* Contending that Plaintiff's claims are subject to the Agreement, which Plaintiff voluntarily signed, Defendant moves for an order dismissing the action without prejudice or an order staying the action and compelling arbitration.[1] (Doc. 6 at 1).

Plaintiff opposes the Motion to Compel Arbitration through four numbered paragraphs and his affidavit in support thereof. (Docs. 11, 11-1). First, citing to the complaint, Plaintiff states that he "has plead[ed] in his Complaint that he has not agreed to arbitration, had not signed an arbitration agreement, and provide[d] notice to Defendant he was not agreeing to an Arbitration Agreement." (Doc. 11 at 1). Next, citing his attached affidavit, Plaintiff claims that he "opted out

---

[1] Anticipating Plaintiff to challenge the Agreement's enforceability, Defendant also argues that the Agreement is valid and enforceable. (Doc. 6 at 9–11).

of arbitration and advised Defendant that he had opted out." *Id.* Significantly, Plaintiff states in his affidavit, "In or about 2014-2015, Aaron's, Inc. presented me with an Arbitration Agreement to be electronically signed." *Id.* at 4. Plaintiff claims that Defendant "was tracking who had responded to the request to sign an Arbitration Agreement." *Id.* Because Defendant had purportedly not received Plaintiff's electronic "response," Rebecca Sosa ("Sosa"), whom Plaintiff identifies as a human resources representative of Defendant, contacted Plaintiff to determine when he was "expected" to electronically sign. *Id.* Plaintiff purportedly advised Sosa that he did not agree to arbitration. *Id.* As such, Plaintiff now contends that Defendant, through Sosa, "had actual knowledge" that Defendant did not agree to arbitration and he "never altered [his] position in this regard." *Id.* On this basis, Plaintiff asserts that any representation by Defendant that he agreed to arbitration, either expressly or impliedly, is "false and misleading." *Id.*

In Defendant's reply to Plaintiff's response in opposition, Defendant asserts that Plaintiff's response "relies solely on a series of patently false representations." (Doc. 17 at 1). In support, Defendant provides another declaration of Reinert. Therein, Reinert, as one of the custodians of personnel records for Defendant, states that Sosa's last day of employment with Defendant was August 15, 2016, prior to when Defendant issued the Agreement to its employees on March 1, 2017. (Doc. 17-1 at 1–2). As such, Defendant contends that Plaintiff's purported conversation with Sosa never occurred because she had not worked for Defendant for more than six months when Defendant sent the March 1, 2017 e-mail about the Agreement to Plaintiff and other employees. (Doc. 17 at 7). In this regard, Defendant contends that Sosa was not even involved with the "roll out" of arbitration program. *Id.* at 6–7. Further, as one of the custodians for opt-out election forms that have been executed and returned by associates, Reinert states that Defendant does not have an executed opt-out election form on file for Plaintiff. (Doc. 17-1 at 3).

Defendant also provides the declaration of Tim Alman ("Alman"), Manager of IT Service Management for Defendant. Alman explains that Defendant sent an e-mail to all associates on March 1, 2017, advising employees that they were required to review and acknowledge the 2017 Associate Policy Manual and the "Associate Arbitration Agreement"[2] before March 31, 2017. (Doc. 17-2 at 2). To access the Agreement on the online portal, Plaintiff would have been required to enter his unique single sign-on ("SSO") credentials. *Id.* at 2. To sign the Agreement, Plaintiff would have, in relevant part, scrolled to the bottom of the Agreement, typed his name, clicked a "Submit" button, and then clicked a "Finish" button. *Id.* at 3. Alman states that Plaintiff "signed the electronic signature page," thereby agreeing to be bound by the Agreement, when he typed his name on March 6, 2017. *Id.* at 4. Alman explains that he is able to confirm Plaintiff's signature because Plaintiff's unique SSO credentials were used. *Id.* Nobody outside of the IT department would have the SSO credentials for Plaintiff or any other associate. *Id.* at 2. Finally, Alman asserts that Plaintiff has never complained of, or reported, any improper use of his unique SSO credentials during his employment with Defendant. *Id.* at 4.

### C.  Motion for Leave to Conduct Limited Discovery

After responding to the Motion to Compel Arbitration, but prior to Defendant's filing of its reply, Plaintiff filed the Motion for Leave to Conduct Limited Discovery. Therein, Plaintiff moves the Court to "abate its decision" on the Motion to Compel Arbitration and grant leave to conduct discovery on the issue of whether Defendant was properly notified of Plaintiff's alleged decision to opt out of arbitration. (Doc. 14 at 3). Reiterating that he opted out of arbitration and advised Defendant that he opted out, Plaintiff cites the affidavit attached to his response in

---

[2] As explained below, Alman identifies the Agreement as a true and correct copy of the "Associate Arbitration Agreement" distributed to all associates. (Doc. 17-2 at 3).

opposition to the Motion to Compel, *id.* at 2, in which, as noted, he asserts that Defendant presented him with an arbitration agreement "[i]n or about 2014-2015" and he advised Sosa that he did not agree to arbitration, (Doc. 11 at 4). Plaintiff accordingly seeks discovery limited to "whether Defendant was properly notified that Plaintiff opted out of arbitration," which Plaintiff contends will assist the Court in determining whether an arbitration agreement between the parties exists. *Id.*

Defendant opposes Plaintiff's request for limited discovery, claiming that Plaintiff has failed to offer any credible evidence that he did not knowingly and voluntarily agree to arbitration. (Doc. 18 at 8). Defendant again disputes Plaintiff's purported conversation with Sosa, but states that, even if Plaintiff had such conversation with some employee of Defendant other than Sosa, the record evidence nonetheless demonstrates that Plaintiff not only failed to submit an opt-out election form, which was required to opt-out of the Agreement, but he also electronically signed the Agreement on March 6, 2017. *Id.* at 7–8.

Plaintiff requested leave to file a reply to Defendant's response in opposition, based on the parties' divergence "on the facts supporting the existence or nonexistence of an arbitration agreement" and Plaintiff's desire to show "misleading information" in Defendant's provided declarations, as well as the declarations' purported concealment of "material information." (Doc. 19 at 1). To highlight that Plaintiff's requested reply was improper because Plaintiff did not seek to rebut new factual or legal arguments advanced by Defendant in its response in opposition to the Motion for Leave to Conduct Limited Discovery, Defendant provided a declaration from Defendant's counsel regarding an attached e-mail from Plaintiff's counsel, in which Plaintiff's counsel described to Defendant's counsel facts purportedly contrary to Defendant's assertions. First, Plaintiff's counsel reiterated that Defendant presented Plaintiff with an arbitration agreement

"[i]n or about 2014-2015," during which time Sosa was employed, thereby purportedly showing that Defendant "did not have an *initial* rollout in 2017." (Doc. 20-1 at 4) (emphasis in original). Plaintiff's counsel also claimed that he had a witness who could testify that Plaintiff notified Sosa that he did not agree to arbitration. *Id.* at 5. Second, Plaintiff's counsel stated, for the first time, that Plaintiff "did not agree to arbitration in 2017." *Id.* Additionally, Plaintiff's counsel stated, also for the first time, that Plaintiff complained on approximately twenty occasions to Defendant's IT department that Plaintiff "had a problem" with his SSO credentials and, as Plaintiff was locked out of his account "many times" from 2014 through 2019, Defendant helped Plaintiff unlock his account frequently "because it appeared that someone tried to use his individual SSO credentials." *Id.* Third and finally, Plaintiff's counsel asserted that Defendant's former Vice President, Marco Salise, "informed" Plaintiff "that he was rehired by [Defendant] in *February* 2017 and was required to sign an arbitration agreement."[3] *Id.* (emphasis in original). Defendant claimed that there was no reason why Plaintiff had failed to offer these facts in his initial motion. *Id.* at 4. The Court denied Plaintiff's request to file a reply. (Doc. 24).

## II.   LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, codifies a "liberal federal policy favoring arbitration" and requires the courts to "rigorously enforce agreements to arbitrate." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625–26 (1985) (internal quotation marks omitted). The "principal purpose" of the FAA is to ensure "that private arbitration agreements are enforced according to their terms." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989).

---

[3] Reinert identifies only a "short break in employment" for Plaintiff from July of 2015 through December of 2015. (Doc. 17-1 at 1).

Three sections of the FAA "play particularly important roles" in the FAA's purposes of overcoming judicial resistance to arbitration and declaring a national policy in favor of arbitration for claims that parties contract to settle in such a manner. *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1345 (11th Cir. 2017). Section 2 of the FAA "makes arbitration agreements 'valid, irrevocable, and enforceable' as written (subject, of course, to [its] saving clause)."[4] *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (quoting 9 U.S.C. § 2). "The FAA thereby places arbitration agreements 'on an equal footing with other contracts . . . and requires courts to enforce them according to their terms." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010). "Like other contracts, they may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *Id.* (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). The Eleventh Circuit has held that arbitration agreements satisfy the "involving commerce" requirement under Section 2 where a defendant-employer's "overall employment practices affect commerce." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1370 (11th Cir. 2005).

---

[4] In its entirety, Section 2 provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving **commerce** to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

Section 3 of the FAA "requires courts to stay litigation of arbitral claims pending arbitration of those claims 'in accordance with the terms of the agreement.'" *Id.* (quoting 9 U.S.C. § 3). Additionally, Section 4 of the FAA provides, in relevant part:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction . . . in a civil action . . . of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4.

Significantly, Section 4 also provides that the court "shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." *Id.* However, "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." *Id.*

The Court must engage in a two-step inquiry in analyzing a motion to compel arbitration: first, the Court must determine if the parties agreed to arbitrate the dispute; and second, the Court must decide whether "legal constraints external to the parties' agreement foreclosed arbitration." *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004).

### III.   ANALYSIS

#### A.  Motion to Compel Arbitration

Defendant moves the Court, under 9 U.S.C. §§ 3 and 4, for an order dismissing the complaint or staying the action and compelling arbitration. (Doc. 6 at 1). Defendant, whose network of corporate-owned retail stores are located throughout the country and whose employees travel between states, provides evidence that the parties entered into the Agreement, which pertains

to certain claims arising from Defendant's employment relationship with its employees, thereby requiring Plaintiff to bring his claims in arbitration. *See generally* (Docs. 6-1, 17-1, 17-2). Providing evidence of his own, Plaintiff claims that he opted out of arbitration and provided the requisite notice to Defendant. (Doc. 11 at 1–2). Thus, Plaintiff argues that he did not agree to arbitrate his claims. For the reasons discussed below, the Motion to Compel Arbitration is due to be granted.

### i. Existence of Agreement to Arbitrate

The Court must determine whether "the making of the agreement for arbitration or the failure to comply therewith is . . . in issue." 9 U.S.C. § 4. "It is . . .well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 288 (2010). "[W]hile doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (internal quotation marks omitted). Indeed, a court may not compel the parties to settle their dispute in arbitration in the absence of an arbitration agreement. *Id.*

The Eleventh Circuit has held that a "summary judgment-like standard" is appropriate for determining the existence of an arbitration agreement. *Id.* at 1333. As such, "a district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if there is no genuine dispute as to any material fact concerning the formation of such an agreement." *Id.* (internal quotation marks omitted). "Where there is no such dispute, a trial is unnecessary." *Larsen v. Citibank FSB*, 871 F.3d 1295, 1308 (11th Cir. 2017). A dispute unsupported by the evidence or created by evidence that is "merely colorable" or "not significantly probative" is not

"genuine." *Bazemore*, 827 F.3d at 1333 (internal quotation marks omitted). Conclusory allegations that lack specific, supporting facts lack probative value for a party opposing summary judgment. *Id.* Further, "entry of summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 1334 (internal quotation marks omitted).

"As in a traditional summary judgment motion, an examination of substantive law determines which facts are material." *Burch*, 861 F.3d at 1346. "The threshold question of whether an arbitration agreement exists at all is 'simply a matter of contract.'" *Bazemore*, 827 F.3d at 1329 (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). Consequently, "just as state law generally governs whether an enforceable contract exists, state law generally governs whether an enforceable agreement to arbitrate exists as well."[5] *Burch*, 861 F.3d at 1346 (internal quotation marks omitted). Even when applying state law, the federal policy favoring arbitration is generally considered. *Caley*, 428 F.3d at 1368.

### 1. Applicable State Law

As state law generally governs whether an agreement to arbitrate exists between parties, the Court begins by determining the applicable state law. While the Agreement provides that the parties recognize that Defendant operates throughout the country in interstate commerce and that the parties acknowledge and agree that the FAA governs the Agreement and arbitration, it does not specify which state's law governs the Agreement. Nonetheless, this action stems from alleged

---

[5] The Eleventh Circuit previously applied a two-part test to determine if an agreement to arbitrate existed between parties, under which the party seeking to avoid arbitration was required to: (1) deny unequivocally the existence of an agreement to arbitrate; and (2) provide evidence substantiating that denial. *Larsen*, 871 F.3d at 1303 n.1. However, the Eleventh Circuit no longer utilizes this test, but instead, as noted, defers "solely to applicable state-law principles in determining the quality and quantum of evidence required to deny or prove the existence of an agreement." *Id.* (citing *Bazemore*, 827 F.3d at 1334).

acts or omissions on behalf of Defendant, as Plaintiffs' employer, during Defendant's employ of him. To that end, Plaintiff alleges that he performed various duties for Defendant "throughout Florida," including in Polk County, Florida. (Doc. 1-1 ¶3). Indeed, Plaintiff claims that a substantial part of the acts or omissions giving rise to his claims against Defendant occurred in Polk County, Florida. *Id.* at ¶15. In addition to his federal claim, Plaintiff brings a claim against Defendant under the Florida Civil Rights Act. *Id.* at ¶¶66–69.

Further, Defendant argues that the Agreement is valid and enforceable under Florida law. (Doc. 6 at 9–11). In response, while Plaintiff disputes whether he agreed to arbitration, he does not dispute the applicability of Florida law. In moving for limited discovery, Plaintiff relies on cases from this Court, both of which rely on Florida law to explain, in part, that a court considering a motion to compel arbitration must decide whether a written agreement to arbitrate exists. (Doc. 14 at 2–3) (citing *Zahm v. OneWest Bank, N.A.*, No. 8:15-cv-765-T-30TBM, 2015 WL 2095644, at *1 (M.D. Fla. May 5, 2015) (Moody, J.); *Dukes v. Sai Fort Myers B, LLC*, No. 2:14-cv-287-FtM-38DNF, 2015 WL 3650804, at *2 (M.D. Fla. June 11, 2015) (Chappell, J.)). As such, "[t]he present case involves an employment relationship in Florida and both parties appear to recognize that Florida law controls the question of whether a valid arbitration agreement exists." *Armont v. K12 (Fla. Cyber Charter Acad. - FLCCA)*, No. 3:19-CV-334-J-34MCR, 2019 WL 7666549, at *7 (M.D. Fla. Dec. 26, 2019) (Richardson, Mag.), *report and recommendation adopted*, No. 3:19-CV-334-J-34MCR, 2020 WL 376957, at *1 (M.D. Fla. Jan. 23, 2020) (Howard, J.). Accordingly, the Court will apply Florida law in analyzing whether an agreement to arbitrate exists between the parties.

## 2. Formation of Agreement and Evidence

Having determined that Florida law is applicable, the Court now must utilize the "summary judgment-like standard" articulated above in analyzing whether an agreement exists between the parties. To prove the existence of a contract under Florida law, the party seeking to enforce the contract must prove "offer, acceptance, consideration and sufficient specification of essential terms." *St. Joe Corp. v. McIver*, 875 So.2d 735, 381 (Fla. 2004).

First, there is no genuine dispute of material fact regarding Defendant's offer, by presenting the Agreement, to submit certain disputes between Plaintiff and Defendant to arbitration. Alman explains that Defendant sent an e-mail to all associates on March 1, 2017, which contained the Agreement. (Doc. 17-2 at 2). A true and correct copy of this e-mail is attached to Alman's declaration. This email informed all associates that they were required to "review and acknowledge . . . the Associate Policy Manual and the Associate Arbitration Agreement before March 31, 2017." *Id.* at 6. According to both Alman and Reinert, Defendant refers to its employees as "associates." *Id.* at 1; (Doc. 17-1 at 2). Alman identifies the Agreement as a true and correct copy of the "Associate Arbitration Agreement" distributed to all associates via this March 1, 2017 e-mail. (Doc. 17-2 at 3). Reinert further identifies the Agreement as a true and correct copy of the "stand-alone Arbitration Agreement" with Defendant into which Plaintiff entered. (Docs. 6-1 at 2; 17-1 at 2). Plaintiff does not dispute, generally or through evidence, that he received the Agreement.

Next, there is no genuine dispute of material fact with respect to the Agreement containing sufficient specification of its terms. "The definition of 'essential term' varies widely according to the nature and complexity of each transaction and is evaluated on a case-by-case basis." *Lanza v. Damian Carpentry, Inc.*, 6 So.3d 674 (Fla. 1st DCA 2006). Defendant provides the Agreement, which states that, "[b]y signing this Agreement, you and the Company each agree that all Claims

between you and the Company will be exclusively decided by arbitration governed by the Federal Arbitration Act before one neutral arbitrator and not by a Court or a Jury." (Doc. 6-1 at 8). The Agreement defines the types of disputes—the "Claims"—which fall within the Agreement's scope. *Id.* The Agreement advises, in bold type, that utilizing arbitration to resolve the covered disputes results in the parties giving up any right that they may have to a judge or jury trial. *Id.* at 12. The Agreement allows employees to opt-out of arbitration and provides, also in bold type, the procedure that they must follow to do so. *Id.* The Agreement further advises that, if an employee does not timely opt out of the Agreement under the specified procedure, the employee will be bound by the Agreement. *Id.* Again, Plaintiff does not dispute, generally or through evidence, that the Agreement contained sufficient specification of essential terms.

There is also no genuine dispute of material fact regarding Plaintiff's acceptance of the Agreement. "Mutual assent is an 'absolute condition precedent to the formation of a contract'" under Florida law. *Dorward v. Macy's, Inc.*, No. 2:10-cv-669-FtM-29DNF, 2011 WL 2893118, at *9 (M.D. Fla. July 20, 2011) (Steele, J.) (quoting *Gibson v. Courtois*, 539 So.2d 459, 460 (Fla. 1989)). "In Florida, it is well-settled that the offeror may specify the terms and manner of acceptance." *Id.*; *see Holloway v. Gutman*, 707 So.2d 356, 357 (Fla. 5th DCA 1998) ("The acceptance of an offer, to result in a contract, must be . . . in the mode, at the place, and within the time expressly or impliedly required by the offer."). A contract may be binding on a party even in the absence of that party's signature if the parties assented to the contract in another manner. *Sundial Partners, Inc. v. Atl. Street Capital Mgmt. LLC*, No. 8:15-cv-861-T-23JSS, 2016 943981, at *5 (M.D. Fla. Jan. 8, 2016) (Sneed, Mag.) (citing *Gateway Cable T.V., Inc. v. Vikoa Constr. Corp.*, 253 So.2d 461, 463 (Fla. 1st DCA 1971)). Indeed, because the offeror is not required to limit the manner of acceptance to an affirmative response, "a party may manifest assent to an

agreement to arbitrate by failing to opt out of the agreement within a specified time." *Dorward*, 2011 WL 2893118, at *10.

Defendant specified two manners of acceptance for the Agreement: Plaintiff could sign the Agreement in the space provided or Plaintiff could neither sign nor opt-out of the Agreement in accordance with Section 17. (Doc. 6-1 at 12). Defendant first presents evidence that Plaintiff signed the Agreement. The Agreement indicates that Defendant already agreed to its terms. *Id.* According to Alman, Plaintiff would have had to provide his consent to sign the Agreement electronically after logging into the secure online portal to view the Agreement. (Doc. 17-2 at 2). If Plaintiff elected not to sign electronically, he would have to go through alternative means to view and acknowledge the document. *Id.* at 2–3. Upon providing his consent to sign electronically, the portal would direct Plaintiff to a screen displaying the Agreement. *Id.* at 3. And further steps were required: even after reviewing the Agreement, Plaintiff would have had to scroll to the bottom of the Agreement, type in his name, and click a "Submit" button. *Id.* Plaintiff would have had to click a "Finish" button, which would have allowed him to download a copy of the document and his signature thereof. *Id.*

Defendant provides a document which it claims demonstrates that Plaintiff signed the Agreement. Specifically, Reinert cites this document to show that Plaintiff voluntarily executed the Agreement's electronic signature page. (Doc. 6-1 at 4). Alman identifies the document as the electronic signature page in which Plaintiff agreed to be bound by the Agreement by typing in his name. (Doc. 17-2 at 4). Under a heading stating, "Arbitration Agreement Eff. 03-01-2017 (DOC0001011)," the document provides, "By providing my signature below I acknowledge that I have read Arbitration Agreement Eff. 03-01-2017 (DOC0001011) and understand it in its entirety." (Doc. 6-1 at 14). Plaintiff's name, clock number, user identification, signature, and

signature date are provided, indicating that Plaintiff signed at 5:08 p.m. on March 6, 2017. *Id.* Both Reinert and Alman state that Plaintiff signed the Agreement on March 6, 2017. [6] (Docs. 17-1 at 2; 17-2 at 4). Alman identifies the electronic signature as belonging to Plaintiff based on the use of Plaintiff's unique SSO credentials, to which nobody outside of the IT department would have had access. (Doc. 17-2 at 2, 4). According to Alman, Plaintiff has never complained of, or reported, any improper use of his unique SSO credentials during his employment with Defendant. *Id.* at 4.

Further, Defendant presents evidence that Plaintiff agreed to the Agreement by failing to opt-out under the procedure specified therein. Indeed, Reinert states in her first declaration that Plaintiff did not elect to opt-out of the Arbitration Agreement, (Doc. 6-1 at 4), and emphasizes in her second declaration, as a custodian for opt-out election forms that have been executed and returned to Defendant by associates, that Defendant does not have an executed opt-out election form on file for Plaintiff, (Doc. 17-1 at 3). Thus, Defendant presents evidence in support of Defendant accepting the terms of the Agreement under both of the alternative methods specified for acceptance.

Plaintiff's affidavit in opposition to the Motion to Compel Arbitration—the only evidence that he provides in opposing the Motion to Compel Arbitration—is unavailing to show that a genuine dispute of material fact exists as to his acceptance of the Agreement. In attempting to show that he opted out of arbitration, Plaintiff broadly claims that he was presented with an arbitration agreement "[i]n or about 2014-2015," but that he simply "advised" Sosa that he "decided to not agree to arbitration." (Doc. 11 at 4). However, Plaintiff's decision not to agree to

---

[6] Although Reinert states in her first declaration that Plaintiff executed the Agreement's signature page on March 1, 2017, (Doc. 6-1 at 4), Reinert states in her second declaration that Plaintiff entered into the Agreement on March 6, 2017, (Doc. 17-1 at 2), which is supported by Alman's declaration, (Doc. 17-2 at 4), and the document itself, (Doc. 6-1 at 14).

the terms of an arbitration agreement in 2014 or 2015, along with his purported notification of this decision to Sosa, fails to show that Plaintiff did not accept the terms of the Agreement in 2017.[7] The affidavit is devoid of any discussion of the Agreement in 2017. Significantly, Plaintiff does not state that he did not sign the Agreement, or that he timely submitted the opt-out election form in compliance with the procedure specified in the Agreement. The Agreement's merger clause further undercuts Plaintiff's argument that his purported rejection of arbitration in 2014 or 2015 somehow constitutes a rejection of the terms of the Agreement in 2017. (Doc. 6-1 at 9). To the extent that Plaintiff attempts to rely on his allegation in the complaint that did he not agree to "an Arbitration Agreement," (Doc. 1-1 ¶12), the law requires the Court, in determining whether an arbitration agreement exists between the parties, to examine whether a genuine dispute of material fact exists by examining evidence, not allegations, *see Bazemore*, 827 F.3d at 1333.

Plaintiff did not file, or seek the Court's leave to file, a sur-reply to respond to the evidence Defendant provided with its reply, which included Alman's declaration and Reinert's second declaration. Instead, Plaintiff relies on his affidavit regarding an arbitration agreement in 2014 or 2015 to request limited discovery on the issue of whether Defendant received proper notification of his decision to opt-out of arbitration. Placing aside the merits of whether these actions in 2014 or 2015 warrant limited discovery on whether Defendant received proper notification of Plaintiff's decision in 2017, Plaintiff does not provide any evidence addressing his acceptance or rejection of the Agreement in 2017. As such, the record demonstrates the absence of a genuine dispute of material fact regarding Plaintiff's acceptance of the Agreement.

---

[7] Defendant's argument in its reply that Plaintiff's conversation with Sosa never occurred, based on Defendant's employment records for Sosa, seemingly overlooks Plaintiff's assertion that he advised Sosa of his decision to decline arbitration following Defendant's presentation of an arbitration agreement in 2014 or 2015, not in March of 2017.

Even if the Court considers the e-mail from Plaintiff's counsel regarding the parties' purported divergence on facts supporting the existence or nonexistence of an arbitration agreement, which was not provided in opposition to the Motion to Compel Arbitration, the e-mail does not alter this conclusion. First, the e-mail merely contains statements from Plaintiff's counsel in responding to Defendant's counsel, not evidence such as a declaration or affidavit. Although Plaintiff's counsel claimed that Plaintiff "did not agree to arbitration in 2017," Plaintiff, in opposing the Motion to Compel Arbitration, fails to present any evidence showing that he timely opted out of the Agreement. Through the Motion to Compel Arbitration and its attached evidence, Defendant clearly asserts that Plaintiff signed the Agreement in March of 2017, yet, as consistently emphasized, Plaintiff responds simply by arguing that Plaintiff did not agree to arbitration in 2014 or 2015.

Similarly, Plaintiff's counsel states in the e-mail that Plaintiff had complained to Defendant on numerous occasions to Defendant's IT department that Plaintiff "had a problem" with his SSO credentials and Defendant frequently helped Plaintiff unlock his account "because it appeared that someone tried to use his individual SSO credentials." (Doc. 20-1 at 4). However, although neither the Motion to Compel Arbitration nor the evidence attached thereto directly address Plaintiff's purported use of his SSO credentials to sign the Agreement electronically (instead, Defendant directly addresses the use of Plaintiff's SSO credentials in its reply), Defendant provides a copy of the Electronic Signature page with the Motion to Compel Arbitration, which lists Plaintiff's name, clock number, user identification, signature, and the date of signature. (Doc. 6-1 at 14). Despite this listed information, Plaintiff fails to make an evidentiary attack on the provided electronic signature page, including the use of the SSO credentials, in responding to the Motion to Compel Arbitration. Indeed, this information was offered neither in Plaintiff's response in

opposition to the Motion to Compel Arbitration, nor the Motion for Leave to Conduct Limited Discovery. Regardless of whether this unsupported assertion was intended to undermine Alman's declaration or serve another purpose, it does not create a genuine dispute of material fact with respect to Plaintiff's acceptance of the Agreement in 2017. The remaining statements from the e-mail from Plaintiff's counsel also fail to create a genuine dispute of material fact here.[8]

Finally, there is no genuine dispute of material fact with respect to the Agreement containing sufficient consideration. "In Florida, one party's promise to submit its claims to arbitration typically provides sufficient consideration to support the other party's promise to submit its claim to arbitration." *Tranchart v. Ritz Carlton Hotel Co., LLC*, No. 2:10-cv-233-FtM-29DNF, 2011 WL 1230734, at *4 (M.D. Fla. Mar. 30, 2011) (Steele, J.). "A promise, no matter how slight, qualifies as consideration if the promisor agrees to do something that he or she is not already obligated to do." *Cintas Corp. No. 2 v. Schwailer*, 901 So.2d 307, 309 (Fla. 1st DCA 2005).

The Agreement provides that, by signing, Plaintiff and Defendant each agree that all "Claims" between the parties will decided by arbitration under the FAA. (Doc. 6-1 at 8). Defendant signed the Agreement prior to its delivery to associates for execution. *Id.* at 12. As discussed above, there is not a genuine dispute of material fact regarding Plaintiff's acceptance of the Agreement. Further, Plaintiff does not challenge the Agreement for lack of consideration. As such, Plaintiff agreed to arbitration per the terms of the Agreement, and Defendant's promise to submit its claims

---

[8] Indeed, neither Plaintiff's response in opposition to the Motion to Compel Arbitration nor the Motion for Leave to Conduct Limited Discovery address Plaintiff's assertions regarding the initial rollout not occurring in 2017 or Mr. Salise informing Plaintiff in February of 2017 that he needed to sign an arbitration agreement. Further, the evidence submitted by Plaintiff in opposition to the Motion to Compel Arbitration does not address these assertions. In any event, even if these assertions are true, neither alters the Court's conclusion.

to arbitration constitutes sufficient consideration to support Plaintiff's promise to submit its claims to arbitration.

Therefore, an analysis of the evidence provided by the parties under applicable law demonstrates that there is not a genuine dispute of material fact regarding the parties' entry into the Agreement. As such, "the making of the agreement for arbitration or the failure to comply therewith is not in issue" and the Court need not summarily proceed to trial on such question. 9 U.S.C. § 4.

### ii.   Remaining Considerations

The Court's conclusion that there is no genuine dispute of material fact regarding the parties' entry into the Agreement does not end the analysis. Also relevant is whether any "legal constraints external to the parties' agreement foreclosed arbitration," *Klay*, 389 F.3d at 1200, and whether the Court or the arbitrator must determine the arbitrability of Plaintiff's claims, *see Gray v. Uber, Inc.*, 362 F. Supp. 3d 1242, 1245 (M.D. Fla. 2019) (Moody, J.) (stating that the Court must first determine whether the parties entered into a binding agreement to arbitrate and, if so, whether the Court or the arbitrator must decide the threshold issue of arbitrability). Although Plaintiff generally challenges his acceptance of the Agreement in 2017 by referencing events in 2014 or 2015, he does not point to any constraints to the Agreement that foreclose arbitration. Defendant, seeking to invoke arbitration under the Agreement, similarly does not point to any such constraints. Accordingly, the record lacks any indication that the arbitration was foreclosed by legal constraints external to the Agreement.

Next, the federal substantive law of arbitrability determines whether a dispute is arbitrable. *Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1170 (11th Cir. 2011). "[W]hether a contract's arbitration clause requires arbitration of a given dispute remains a matter of contract

interpretation." *Seaboard Coast Line R.R. Co. v. Trailer Train Co.*, 690 F.2d 1343, 1348 (11th Cir.

1982). In examining the language of the Agreement, the Court must bear in mind that "any doubts

concerning the scope of the arbitrable issues should be resolved in favor of arbitration." *Klay*, 389

F.3d at 1201. The Agreement provides:

> A court of competent jurisdiction, and not the Arbitrator, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this Agreement, including, but not limited to any claim that all or any part of this Agreement is void or voidable.

(Doc. 6-1 at 9).

Thus, the Agreement provides that the Court has the exclusive authority to resolve any

dispute regarding interpretation, enforceability, or applicability of the Agreement. The Agreement

provides that all "Claims" between Plaintiff and Defendant will be decided exclusively by

arbitration. *Id.* at 8. "Claims" refers to disputes arising out of Plaintiff's employment by Defendant

and "includes, but is not limited to, any claim arising under federal, state, or local law, under a

statute such as Title VII of the Civil Rights Act of 1964 (Title VII) . . . the Fair Labor Standards

Act (FLSA) . . . to name a few, under a rule, regulation or the common law, including, but not

limited to any wage and hour claim of discrimination, harassment, retaliation, defamation, or

wrongful discharge." *Id.* Thus, the Agreement explicitly provides that an FLSA claim is subject to

arbitration. As such, Plaintiff's FLSA claim, which arises out of Plaintiff's employment for

Defendant because he seeks "overtime wages he earned," falls within the scope of the Agreement.

(Doc. 1-1 ¶60).

Additionally, Plaintiff's claim under the Florida Civil Rights Act also arises out of his

employment with Defendant because he alleges that "Defendant, via its agents, representatives,

and employees" discriminated against him by failing to promote him as a result of his diabetes and

depression. *Id.* at ¶¶44, 47, 68. This claim arises under state law and under a statute such as Title

VII. Indeed, the Florida Legislature patterned the Florida Civil Rights Act after Title VII. *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998). Further, the language of the Agreement broadly evidences an intent to subject claims of discrimination, such as Plaintiff's claim under the Florida Civil Rights Act, to arbitration. Further, the Agreement identifies all "Claims" brought after March 1, 2017, such as Plaintiff's claims, regardless of whether the alleged act or omission occurred before March 1, 2017. (Doc. 6-1 at 12). Finally, the Court notes that, in opposing arbitration, Plaintiff does not assert that his claims are outside the scope of the Agreement. Therefore, Plaintiff's claims fall within the scope of the Agreement.

In sum, there is no genuine dispute of material fact regarding the formation of an agreement to arbitrate certain claims between the parties. Defendant provides evidence demonstrating, among other things, that Plaintiff received the Agreement, electronically signed the Agreement on March 6, 2017, and otherwise failed to opt-out of the Agreement in accordance with its terms. Plaintiff fails to make a sufficient evidentiary showing in opposition to create a genuine dispute of material fact. The record is devoid of any legal constraints foreclosing arbitration, and Plaintiffs' claims fall within the Agreement's scope. As such, Plaintiff's claims must proceed in arbitration in accordance with the Agreement.

Finally, Defendant moves for an order either dismissing the complaint without prejudice or staying the action and compelling arbitration. (Doc. 6 at 1). The FAA provides, in relevant part, that, in any lawsuit brought upon any issue that is "referable" to arbitration under an arbitration agreement, the Court, upon satisfaction that the issue is referable to arbitration under such agreement, must stay the trial of the action on application of a party until such arbitration has been held under the terms of the agreement. 9 U.S.C. § 3. The Eleventh Circuit has highlighted the propriety of staying an action pending arbitration in accordance with this section. *See Bender v.*

*A.G. Edwards & Sons, Inc.*, 971 F.2d 698, 699 (11th Cir. 1992) ("The district court properly found that state law claims were subject to arbitration; but erred in dismissing the claims rather than staying them. Upon finding that a claim is subject to an arbitration agreement, the court should order that the action be stayed pending arbitration."); *Caley*, 428 F.3d at 1369 (stating that the "FAA's enforcement sections require a court to stay a proceeding where the issue in the proceeding 'is referable to arbitration'" under a written arbitration agreement); *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Worker Int'l Union AFL-CIO-CLC, USW Local 200 v. Wise Alloys, LLC*, 807 F.3d 1258, 1268 (11th Cir. 2015) (stating that a stay is proper where Section 3 of the FAA is applicable and a party requests a stay).

The Court has previously stayed actions pending completion of arbitration instead of ordering dismissal. *E.g.*, *Fraser v. Perkins & Marie Callender's LLC*, No. 8:16-cv-3226-T-23AEP, 2016 WL 7492464, at *2 (M.D. Fla. Dec. 30, 2016) (Merryday, C.J.) (staying the action pending arbitration and emphasizing that Section 3 of the FAA precludes dismissal); *Stephens v. Checkr, Inc.*, No. 8:19-cv-2252-T-36AAS, 2019 WL 8138178, at *8 (M.D. Fla. Nov. 25, 2019) (Honeywell, J.) (staying the action, rather than dismissing it, based on the above-cited law). Given the applicability of Section 3 of the FAA, the relevant caselaw, and Defendant's alternative request for a stay, the Court will stay this proceeding pending the arbitration of Plaintiff's claims.

### B.  Motion for Leave to Conduct Limited Discovery

Given the analysis above, the Court need address the Motion for Leave to Conduct Limited Discovery only briefly. As noted above, Plaintiff requests limited discovery "on the issue of whether Defendant was properly notified that Plaintiff opted out of arbitration." (Doc. 14 at 3). In the Motion for Leave to Conduct Limited Discovery, which Plaintiff filed after Defendant filed the Motion to Compel Arbitration, Plaintiff claims that the proposed discovery will "assist the

Court in its determination of whether an arbitration agreement exists between the parties." *Id.* at 2. However, to support his request, Plaintiff relies solely on his statements in his affidavit that, in 2014 or 2015, when Defendant presented him with an arbitration agreement, he decided not to agree to this arbitration agreement and advised Sosa of his decision. *Id.* Thus, Plaintiff's alleged decision to reject an arbitration agreement in 2014 or 2015, along with his purported notification of such decision to Defendant, serves as his basis for requesting discovery regarding whether an arbitration agreement exists between the parties following Defendant's publication of the Agreement in 2017. The Court has detailed extensively the specified methods for acceptance of the Agreement's terms, the Agreement's opt-out provision, and Defendant's records, including the electronic signature page. Plaintiff's argument here simply mirrors his argument in opposition to the Motion to Compel Arbitration. Once again, the argument falls short. Plaintiff simply fails to demonstrate why any decision to reject an arbitration agreement from Defendant in 2014 or 2015 justifies limited discovery regarding the purported formation of the Agreement in 2017. As such, the Motion for Leave to Conduct Limited Discovery is due to be denied.

## IV.   CONCLUSION

Accordingly, it is **ORDERED**:

1. Defendant's Opposed Motion to Dismiss or, Alternatively, to Stay this Action and Compel Arbitration, (Doc. 6), is **GRANTED**.

2. Plaintiff is compelled to arbitrate his claims against Defendant as asserted herein.

3. This action is **STAYED** pending completion of arbitration. The parties shall file a notice informing the Court that the arbitration has been concluded, or that their dispute has otherwise been resolved, within **FOURTEEN (14) DAYS** of either of such event and immediately dismiss the case, if appropriate.

4. Plaintiff's Motion for Leave to Conduct Limited Discovery Pending Court Decision of Defendant's Motion to Compel Arbitration, (Doc. 14), is **DENIED**.

5. The Clerk is directed to terminate all pending motions and deadlines and administratively close this case.

   **DONE AND ORDERED** in Tampa, Florida on May 7, 2020.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any